UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Tara Foster, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| EssilorLuxottica S.A.; Luxottica Group S.p.A.; Essilor International SAS; EssilorLuxottica USA Inc.; Luxottica U.S. Holdings Corp.; Essilor Laboratories of America Holding Co. Inc.; Luxottica of America, Inc.; Essilor of America Inc.; EyeMed Vision Care, LLC; and Vision Source, LLC, | |
| Defendants, | |

Plaintiff Tara Foster ("Plaintiff") brings this action individually and on behalf of a class of all others similarly situated (the "Class") against Defendants[1] for damages and injunctive relief, and alleges the following:

## I.    NATURE OF THE ACTION

1.    The vast majority of Americans wear eyeglasses.[2]  Consumers believe that they can select eyewear[3] manufactured and distributed by companies such as Armani, Ralph Lauren or Versace, and purchase it from independent brick-and-mortar stores such as LensCrafters or Pearle Vision or online sites such as FramesDirect.com or Glasses.com.   But all these manufacturers and retailers are owned by a single company: EssilorLuxoticca.

2.    EssilorLuxottica manufactures and distributes eyewear to retailers and sells them to consumers through its own retailers, although the vast majority of consumers are unaware of EssilorLuxottica's control of the eyewear market because it markets and advertises its products as separate brands manufactured by separate companies and sold through separate channels of distribution.

---

[1] "Defendants" or "EssilorLuxottica" collectively references EssilorLuxottica S.A.; Luxottica Group S.p.A.; Essilor International SAS; EssilorLuxottica USA Inc.; Luxottica, U.S. Holdings Corp.; Essilor Laboratories of America Holding Co. Inc.; Luxottica of America, Inc.; Essilor of America Inc.; EyeMed Vision Care, LLC; and Vision Source, LLC.

[2] According to The Vision Council, a trade association for the optical industry, more than 166 million American adults wear prescription eyewear. https://thevisioncouncil.org/sites/default/files/assets/media/TVC_OrgOverview_sheet_2021.pdf (last visited Nov. 28, 2023).

[3] "Eyewear" collectively refers to eyeglasses, sunglasses, and corrective lenses.  Corrective lenses" refers to corrective ophthalmic lenses for eyeglasses or sunglasses. "Corrective lenses" does not include contact lenses.

3.      In fact, Essilor Luxottica owns or controls 80% of major eyewear brands manufacturing market.[4]  EssilorLuxottica owns significant portion of the of the distribution and sale market through its ownership of major eyewear retailers and Eyewear, a vision benefits company through which they can exercise control over more than 80% of the independent optometrists in the United States through EyeMed's contractual requirements and incentives for its in-network eyecare providers to carry and fit Defendants' Eyewear.[5]

4.      More specifically, EssilorLuxottica owns numerous luxury and premium brands, and it has lengthy exclusive distribution rights for most of the remaining brands.  Downstream, EssilorLuxottica sells Premium-Branded Eyewear from those brands though its own retail channels.

5.      EssilorLuxottica acquired its monopoly power through an aggressive campaign to increase market share, by acquiring competitors and excluding competitors. EssilorLuxottica is an international vertically-integrated monopolist whose course of conduct in acquiring and maintaining its monopoly power violates the antitrust laws.

6.      EssilorLuxottica has taken multiple steps to strengthen its control over pricing and sales of Premium-Branded Eyewear.

- EssilorLuxottica prevents authorized third-party retailers from competing on price through the use of most favored nation and/or minimum resale price maintenance agreements. In

---

[4] Ana Swanson, *Meet the Four-Eyed, Eight-Tentacled Monopoly That Is Making Your Glasses So Expensive*, Forbes (Sept. 10, 2014), *available at* https://www.forbes.com/sites/anaswanson/2014/09/10/meet-the-four-eyed-eight-tentacled-monopoly-that-is-making-your-glasses-so-expensive/?sh=3bff0f726b66 (last visited Nov. 28, 2023).

[5] David Balto, *Get Ready to Pay When One Company Dominates the Eyeglass Market*, The Hill (Nov. 28, 2017), available at https://thehill.com/opinion/healthcare/362146-get- ready-to-pay-when-one-company-dominates-the-eyeglass-market/ (last visited Nov. 28, 2023).

the rare instances in which it does not own or have exclusive rights to distribute a luxury brand, EssilorLuxottica has entered into long-term sales agreements that permit it to sell those brands through its owned and controlled retail channels, with terms that keep prices high and prevent price competition at the retail level.

- EssilorLuxottica also uses the leverage it possesses from its ownership of leading vision care insurers and optometrist group purchasing organizations to steer patients at thousands of supposedly "independent" eyecare professionals toward purchasing its own eyeglasses and sunglasses, rather than the products of its few remaining competitors.

7.      Through its own actions and those of its subsidiaries, as well as its contracts with third parties, EssilorLuxottica controls the manufacture, distribution and pricing of the majority of Premium-Branded Eyewear purchased by consumers through carefully-coordinated actions, including:

- exclusive licensing agreements with well-known fashion houses, pursuant to which only EssilorLuxottica may sell the Premium-Branded Eyewear at wholesale and can exercise control of retail sales through the chain of distribution;

- sales agreements with competing Premium-Branded Eyewear companies, pursuant to which EssilorLuxottica pays competing Premium-Branded Eyewear brands to sell their Premium-Branded Eyewear to consumers with terms such as royalties or payment of a percentage of the sales that incentivizes those competitors not to compete on price through other retail sales outlets; and

- most favored nation agreements, pursuant to which third parties may not sell EssilorLuxottica's owned or exclusively-licensed Premium-Branded Eyewear brands at a lower price.

8. Defendants' conduct has not escaped scrutiny from antitrust regulators. For example, within the last three years, France's competition authority has twice fined Defendants, totaling more than 200 million euros, for anticompetitive conduct related eyewear.

9. Plaintiff brings this class action on behalf of the Rule 23 Class defined below to put a stop to Defendants' antitrust violations and recover damages for the harm caused by the conduct described in this Complaint. Defendants' conduct is facially anticompetitive and illegal per se. Alternatively, and as discussed below, the anticompetitive effects vastly outweigh any competitive benefits and so Defendants' conduct is also illegal under a rule of reason analysis.

## II.    JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

11. This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and permits all process in such cases to be served in any district where the corporation may be found. Further, Defendants' unlawful acts were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

12. Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintains business facilities, has agents, transacts business, and is otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## III.   PARTIES

### A.   Plaintiff

13.    Plaintiff Tara Foster is a citizen and resident of the state of Minnesota.  Plaintiff directly purchased one or more of Defendants' Premium-Branded Eyewear directly from one or more of Defendants' Retail Outlets or Defendants' co-conspirators during the Class Period for her personal or household consumption, including Ralph Lauren and Ray Ban eyewear at Target Optical between 2014 and 2022.  Plaintiff paid higher prices for Defendants' Premium-Branded Eyewear directly to a Defendant or Defendants' co-conspirators by reason of the violations alleged herein.  Plaintiff may directly purchase Defendants' Premium-Branded Eyewear directly from one or more of Defendants' Retail Outlets or Defendants' co-conspirators in the future.

### B.   Defendants

14.    Defendant EssilorLuxottica S.A. is a joint stock company incorporated under the laws of France, with a registered office at 147 rue de Paris 94220, Charenton-Le-Pont, France. EssilorLuxottica S.A. was formed from the 2018 merger of Luxottica Group S.p.A. and Essilor International SAS. EssilorLuxottica S.A. owns GrandVision BV.

15.    Defendant Luxottica Group S.p.A. is a corporation organized under the laws of Italy with its principal place of business at Piazzale Luigi Cadorna 3, 20121 Milan, Italy, and an office in the United States at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica Group S.p.A. owns Defendant Luxottica U.S. Holdings Corp. and online retailer Glasses.com. Luxottica Group S.p.A. also owns Alain Mikli, Arnette, Costa Del Mar, Inc., Oakley, Inc., Oliver Peoples, Persol, Ray-Ban, Sferoflex, Starck Biotech Paris, and Vogue Eyewear (collectively, "Proprietary Brands"), and holds exclusive licenses for the Premium-Branded Eyewear brands of the Fashion Houses (defined below). To the extent that several of the Fashion Houses have renewed their licensing agreements

since the merger of Luxottica Group S.p.A. and Essilor International SAS, EssilorLuxottica S.A. may hold these licensing agreements directly.

16.    Defendant Essilor International SAS is a French simplified joint-stock company with its principal place of business at 147 rue de Paris 94220, Charenton-le-Pont, France. Essilor International SAS owns Defendant Essilor Laboratories of America Holding Co. Inc., Costa Del Mar, Inc., and Defendant Vision Source, LLC.

17.    Defendant EssilorLuxottica USA Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. EssilorLuxottica USA Inc. is a holding company for EssilorLuxottica S.A.'s North American business activities.

18.    Defendant Luxottica U.S. Holdings Corp. is a Delaware corporation with its principal place of business at 44 Harbor Park Drive, Port Washington, New York 11050. Luxottica U.S. Holdings Corp. owns Defendant Luxottica of America, Inc.

19.    Defendant Essilor Laboratories of America Holding Co. Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. Essilor Laboratories of America Holding Co. Inc. owns Defendant Essilor of America Inc.

20.    Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica of America, Inc., owns Premium-Branded Eyewear retailers LensCrafters, Pearle Vision, Target Optical, and Sunglass Hut (together with Oakley retail stores, Ray-Ban retail stores, Glasses.com, FramesDirect.com, and For Eyes, "Retail Outlets"). Luxottica of America, Inc., also owns Defendant EyeMed Vision Care, LLC.

21.    Defendant Essilor of America Inc. is a Delaware corporation with its principal place of business at 13555 N. Stemmons Fwy, Dallas, Texas 75234. Essilor of America Inc. owns Defendants Vision Source and Frames for America, Inc.

22.    Defendant EyeMed Vision Care, LLC, is a company formed under the laws of Delaware with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040 United States. Defendant Luxottica of America, Inc., owns Defendant EyeMed Vision Care, LLC.

23.    Defendant Vision Source, LLC, is a company formed under the laws of Texas with its principal place of business at 23824 Highway 59 N, Kingwood, Texas 77339. Defendant Essilor International SAS owns Defendant Vision Source, LLC.

### C.    Co-Conspirators

24.    Various persons and entities other industry participants, including the members of the Captive Optometrist Groups (defined below), the in-network eyecare professionals with EyeMed, and the Third Party Sellers, known and unknown to Plaintiff and not named as defendants in this action, entered in agreements with the named Defendants are anticompetitive restraints of trade that resulted in or supported EssilorLuxottica's market power and collection of monopoly rents for the sale of its Premium-Branded Eyewear to Plaintiff and Members of the Class.

### D.    Joint Corporate Operations

25.    Defendants operate together as a single commercial entity and act as the agents of EssilorLuxottica with the goal of furthering the anticompetitive actions of Defendants in the Premium-Branded Eyewear market (defined below) and collection of monopoly rents for the sale of its Premium-Branded Eyewear, both directly and through third-party channels.

## IV.    MARKET DEFINTION

26.    The relevant product market is the market for high- end, designer brand prescription and non-prescription eyeglasses and sunglasses (Premium-Branded Eyewear Market). This market does not include corrective lenses, contact lenses, or non-premium-branded mass consumer eyewear (prescription and non-prescription eyeglasses and sunglasses). The relevant geographic market is the United States.

27.     The Premium-Branded Eyewear market is distinct from the non-premium-branded mass consumer eyewear market.   Premium-Branded Eyewear is known for its perceived disassociation from mass consumerism.[6]  This is confirmed by EssilorLuxottica:  Premium-Branded Eyewear, unlike mass-consumer eyewear, is marketed and sold as "desirable fashion accessories that enable self-expression and enhance self-confidence[]," wherein "buying eyeglasses is shift[ed] from a purely functional purchase to a more emotional one." [7]

28.     Mass-consumer eyewear, on the other hand, is designed, marketed and sold to consumers who seek value and functionality.  Premium-Branded Eyewear Manufacturers do not consider mass consumer eyewear manufacturers as competitors.  Premium-Branded Eyewear Manufacturers do not compete on pricing with manufacturers of mass consumer eyewear.

29.     Similarly, purchasers of Premium-Branded Eyewear would not purchase mass consumer eyewear in the face of an increase in the price of Premium-Branded Eyewear.

## V.     MARKET POWER

30.     EssilorLuxottica is the largest eyewear company in the world.  It owns more than 18,000 stores, including 3,800 stores in North America.

31.     In the United States, EssilorLuxottica controls more than half of the Premium-Branded Eyewear Market, has thousands of retail outlets, and exerts control over more than 80% of the optometrists.  EssilorLuxottica has no substantive rivals in the United States.

---

[6] *Great Reasons Why Luxury Eyewear is Worth it*, VILLA EYEWEAR (Mar. 23, 2023), https://villaeyewear.com/blog/3-great-reasons-why-luxury-eyewear-is-worth-it/.(last visited Nov. 28, 2023).

[7] *2022 Universal Registration Document*, ESSILORLUXOTTICA, 18 (Mar. 10, 2023), https://www.essilorluxottica.com/en/cap/content/101986/ (hereinafter "EL 2022 URD").

32.     During the Class Period, EssilorLuxottica possessed monopoly power in the Premium-Branded Eyewear Market.

33.     EssilorLuxottica dominates the Premium-Branded Eyewear Market, making it unlikely any new entrant could gain meaningful share.

34.     Essilor Luxottica possesses monopoly power, as evidenced by its ability to set retail prices of Premium-Branded Eyewear at supracompetitive prices.  EssilorLuxottica can set retail prices substantially higher than its competitors in the market for Premium-Branded Eyewear without losing customers.

## VI.    BARRIERS TO ENTRY

35.     There are significant barriers to entry in the Premium-Branded Eyewear Market.

36.     Consumers have brand loyalty. EssilorLuxottica owns, or controls through Exclusive Licensing Agreements and Sales Agreements, nearly all of the major brands of Premium-Branded Eyewear.

37.     Manufacturing facilities are expensive to build,[8] and retail outlets are expensive to open, establishing a significant barrier to entry.

38.     EssilorLuxottica's long-term Exclusive Licensing Agreements preclude would-be competitors from entering the market because they would not have the opportunity to contract with the Fashion Houses to sell their Licensed Brands.

---

[8] For example, Warby Parker spent $15 million to build an optical lab in New York.  Micheal D'Onofrio, *Warby Parker eyewear opens Rockland Facility,* lohud (Jan. 11, 2017) https://www.lohud.com/story/money/business/2017/01/11/warby-parker-factory-sloatsburg/96433656/ (last visited Nov. 28, 2023).

## VII.    FACTUAL ALLEGATIONS

### A.    EssilorLuxottica

39.    Though Essilor International SAS can trace its history to 19th century France, it was formed as a legal entity in 1972. Essilor International SAS is the largest global manufacturer of corrective lenses. It also owns consumer Eyewear brands and retail outlets.

40.    Luxottica Group S.p.A. began as an eyeglass frames company in Italy in 1961.

41.    EssilorLuxottica is a vertically integrated corporate conglomerate that designs, manufactures, distributes, and sells Eyewear to consumers.

42.    EssilorLuxottica controls the dominant market share in the Eyewear industry.  In 2014, EssilorLuxottica owned an estimated 80% of the major brands of eyeglasses globally.[9] Since that time, EssilorLuxottica has acquired other eyeglass brands, further increasing its market share.

43.    EssilorLuxottica is among the largest players in both the vision benefits and eyecare industries. EssilorLuxottica controls over 80% of optometrists in the United States[10] through its ownership of the vision benefits company, EyeMed, major retail outlet chains, and affiliated eyecare providers.

44.    EssilorLuxottica obtained market power in the Premium-Branded Eyewear Market through a series of acquisitions, anticompetitive agreements, and steering practices, described below.  EssilorLuxottica used that market power to has charged supracompetitive prices Eyewear

---

[9] Ana Swanson, *Meet the Four-Eyed, Eight-Tentacled Monopoly That Is Making Your Glasses So Expensive, Forbes* (Sept. 10, 2014), https://www.forbes.com/sites/anaswanson/2014/09/10/meet-the-four-eyed-eight-tentacled-monopoly-that-is-making-your-glasses-so-expensive/?sh=3bff0f726b66 (last visited Nov. 28, 2023).

[10] David Balto, *Get Ready to Pay When One Company Dominates the Eyeglass Market*, The Hill (Nov. 28, 2017), available at https://thehill.com/opinion/healthcare/362146-get-ready-to-pay-when-one-company-dominates-the-eyeglass-market/ (last visited Nov. 28, 2023).

purchased directly by Plaintiff and the Class, evidenced, in part, by the dramatic increase in EssilorLuxottica's operating margins during the class period.[11] In addition, EssilorLuxottica's market power forestalled innovation, which results in reduced competition.

45.     EssilorLuxottica owns numerous well-known, popular, and commercially successful Premium-Branded Eyewear brands, including Alain Mikli, Arnette, Costa Del Mar, Foster Grant, Oakley, Oliver Peoples, Persol, Ray-Ban, Sferoflex, Starck Biotech Paris, and Vogue Eyewear (collectively, "Proprietary Brands"). EssilorLuxottica steadily acquired these Proprietary Brands before and during the Class Period.

46.     EssilorLuxottica sells Proprietary Brands' Premium-Branded Eyewear through its vast network of retailers including thousands of brick-and-mortar stores such as LensCrafters, Pearle Vision. Sunglass Hut, Oakley Stores, Target Optical, Cole National and For Eyes, and through e-commerce sites such FramesDirect.com, Glasses.com (the retail stores and e-commerce sites are known collectively "Retail Outlets"). EssilorLuxottica steadily acquired these Retail Outlets before and during the Class Period.

47.     EssilorLuxottica owns significant, successful eyecare groups, including Vision Source (a group of 3,100 optometry practices) and the Professional Eyecare Resources Cooperative ("PERC") and Infinity Vision Alliance ("IVA") (optometry group purchasing organizations) (collectively, "Captive Optometrist Groups"). EssilorLuxottica acquired these groups before and during the Class Period.

---

[11] Full Year 2022 Results, EssilorLuxottica,
https://www.essilorluxottica.com/en/newsroom/press-releases/fy-2022-results/ (last visited Nov. 28, 2023).

48.    EssilorLuxottica also owns EyeMed, a well-known, popular, and commercially successful vision-benefits business with more than 50 million members.[12]  It is the second-largest vision benefit company in the United States, accepted at more than 30,000 optometrists.[13]

49.    EssilorLuxottica is a leading manufacturer of Premium-Branded Eyewear, having steadily acquired numerous manufacturing companies, including those that manufacture proprietary products, before and during the Class Period.

**B.    Anticompetitive Conduct**

    **1.    EssilorLuxottica uses Exclusionary Conduct to Acquire Competitors and Eliminate Competition.**

50.    EssilorLuxottica acquired companies through exclusionary conduct in the Premium-Branded Eyewear market.

51.    Having acquired many brands of Eyewear, Luxottica set its sights on becoming the world's first significant eyewear manufacturer to enter the United States retail market.[14]  In 1995, Luxottica commenced a hostile takeover of U.S. Shoe Corporation, which owned LensCrafters, the largest retail eyewear chain in the United States.  Luxottica sold off U.S. Shoe's non eyewear assets and used LensCrafters to sell primarily Luxottica's Eyewear.

52.    Upon acquiring Sunglass Hut in 2001, Luxottica demanded price concessions from its suppliers. Oakley, Sunglass Hut's most significant supplier, refused.  Sunglass Hut stopped selling Oakley sunglasses and Luxottica, Sunglass Hut's parent, used the power of its vertical

---

[12]    https://eyemed.com/resource/blob/15684/d036da1450b16e03689b9114254b28f1/final-navcp-vhs-ruecker-release--data.pdf. (last visited Nov. 28, 2023).

[13]David Balto, *Get Ready to Pay When One Company Dominates the Eyeglass Market,* Nov. 28, 2017,   https://thehill.com/opinion/healthcare/362146-get-ready-to-%20pay-when-one-company-dominates-the-eyeglass-market/ (last visited Nov. 28, 2023).

[14]  https://www.luxottica.com/sites/luxottica.com/files/20f_2016.pdf (at 20) (last visited Nov. 28, 2023).

integration to design, produce, market and sell Ray-Ban sunglasses that incorporated some of Oakley's signature design aspects.    As one former Luxottica executive put it: "We were doing stuff like creating fake Oakleys. There was a kind of war going on."[15] Indeed, this "war" resulted in serious injury to Oakley as its share price lost more than one-third of its value.[16]

53.    Oakley sued Luxottica in 2001, and the parties settled, with Luxottica agreeing to acquire Oakley in 2007 for $2.1 billion.[17]

### 2.    EssilorLuxottica uses Horizontal Restraints to Eliminate Competition.

54.    The Exclusive Licensing Agreements, Sales Agreements, and Most Favored Nations ("MFN") Agreements described below (collectively, "Horizontal Restraints") give EssilorLuxottica control over pricing of the Licensed Brands and the Competing Eyewear Entities' brands.    As a result, EssilorLuxottica can charge supracompetitive prices to Plaintiff and Class Members.

55.    Through the Horizontal Restraints, EssilorLuxottica ensures that the Proprietary Brands, Licensed Brands, and Competing Eyewear Entities' brands of Premium-Branded Eyewear are priced above competitive levels within its Retail Outlets and at Third Party Sellers.

56.    Publicly available information confirms the supracompetitive prices of these brands of Eyewear. Some industry observers have estimated that the markup on Premium-Branded Eyewear runs as high as 1,000%.[18]  These prices would fall in a competitive marketplace.

---

[15]  Sam Knight, *The Spectacular Power of Big Lens*, THE GUARDIAN (May 10, 2018), https://www.theguardian.com/news/2018/may/10/the-invisible-power-of-big-glasses-eyewear-industry-essilor-luxottica (last visited Nov. 28, 2023).

[16] Id.
[17]    Luxottica    to    Acquire    Oakley    in    Deal    Valued    at    $2.1    billion. https://www.wsj.com/articles/SB118242914758643332.  (last visited Nov. 28, 2023)
[18] Chavie Lieber, Glasses can have a markup of 1,000%.  Two former LensCrafters Executives Revealed Why.  https://www.vox.com/the-goods/2019/3/6/18253555/eyeglasses-cost-lenscrafters-essilor-luxottica (last visited Nov. 28, 2023).

a.      **Exclusive Licensing Agreements with Fashion Houses**

57.    EssilorLuxottica has entered into anticompetitive exclusive long-term licensing agreements with prominent Fashion Houses to produce and distribute their Eyewear.[19] The Agreements prevent rivals from acquiring rights to produce or distribute these famous brands. The Fashion Houses are horizontal competitors in the Premium-Branded Eyewear Eyewear Market with EssilorLuxottica's Proprietary Brands.[20]

58.    At all material times, the Fashion Houses operated or had access to independent facilities for the manufacture of their Premium-Branded Eyewear and each of the Fashion Houses either produced or had the ability to produce their own Premium-Branded Eyewear.

59.    EssilorLuxottica steadily and regularly entered into exclusive licensing agreements with the Fashion Houses related to their Licensed Brands over time.

60.    The Exclusive Licensing Agreements contain a lengthy term – often ten years or longer.  The length of these contracts restricts the ability of competitors or entrants to compete because they cannot contract with the Fashion Houses to distribute the Fashion Houses' Licensed Brands.

---

[19] EssilorLuxottica has interested into exclusive licensing agreements with fashion houses, including BBGI US, Inc., Brunello Cucinelli S.p.A., Brunello Cucinelli, USA, Inc., Bulgari S.p.A., Bulgari Corporation of America, Burberry Group plc, Burberry Limited, Chanel Ltd, Chanel, Inc., Dolce & Gabbana S.r.l., Dolce & Gabbana USA Inc., Ferrari S.p.A., Gianni Versace S.r.l., Versace USA, Inc., Giorgio Armani S.p.A., Giorgio Armani Corporation, Michael Kors (USA), Inc., Prada S.p.A., Prada USA Corporation, Ralph Lauren Corporation, Tapestry, Inc., Tiffany & Co., and Tory Burch LLC (collectively, "Fashion Houses").

[20] The Fashion Houses' Eyewear brands include well-regarded brands such as Armani Exchange, Brooks Brothers, Brunello Cucinelli, Bulgari, Burberry, Chanel, Chaps, Coach, DbyD, Dolce & Gabbana, Emporio Armani, Giorgio Armani, Michael Kors, Miu Miu, Native, Polo by Ralph Lauren, Ralph Lauren, Swarovski, Tiffany & Co., Tory Burch, and Versace (collectively, "Licensed Brands").

61.    The licensing agreements between EssilorLuxottica and the Fashion Houses are multi-year licenses for the exclusive rights to design, manufacture, and distribute the Fashion Houses' Licensed Brands of Premium-Branded Eyewear, including distribution into, within, and throughout the United States (the "Exclusive Licensing Agreements").

62.    Under the Exclusive Licensing Agreements, EssilorLuxottica has the exclusive right to determine the selling price for the Licensed Brands, and EssilorLuxottica pays royalties to the Fashion Houses on the sale of their Licensed Brands of Premium-Branded Eyewear.

63.    EssilorLuxottica's Exclusive Licensing Agreements contain anticompetitive price coordination clauses, often through a most-favored nation clause, that establish retail pricing floors on the Licensed Brands as determined, controlled, monitored, and enforced by EssilorLuxottica.[21] These clauses result in alignment of prices for Licensed Brands to supra-competitive levels as set by EssilorLuxottica.

64.    The Exclusive Licensing Agreements give EssilorLuxottica the authority to set prices for the Licensed Brands of Premium-Branded Eyewear, or otherwise provide the means for EssilorLuxottica to control, maintain, and inflate the prices for all the Licensed Brands of Premium-Branded Eyewear in the United States, causing injury to Plaintiff and Class Members.

b.    **Sales Agreements with Competing Eyewear Entities**

---

[21] *See* Andrew Goodman, *There's More to Ray-Ban and Oakley Than Meets the Eye*, FORBES (Jul. 16, 2014, 12:42PM EDT), https://www.forbes.com/sites/agoodman/2014/07/16/theres-more-to-ray-ban-and-oakley-than-meets-the-eye/?sh=45e5b1e22cd3 (prior to Luxottica's merger with Essilor, these same licensing agreements permitted Luxottica to design, produce, and determine the selling price of Premium-Branded Eyewear brands, including, but not necessarily limited to: "Chanel , Prada , Miu Miu, Dolce & Gabbana, Bulgari, Tiffany & Co ., Versace, Burberry, Polo Ralph Lauren , Donna Karan, DKNY, Paul Smith, Brooks Brothers, Stella McCartney, Tory Burch, Coach , Armani and Starck Eyes.").

65.     EssilorLuxottica enters sales agreements with third party Premium-Branded Eyewear Premium-Branded Eyewear manufacturers, owners, or license holders ("Competing Eyewear Entities")[22] who are horizontal competitors in the Premium-Branded Eyewear Market with EssilorLuxottica's Proprietary Brands. The sales agreements contain terms in common with the anticompetitive Exclusive Licensing Agreements between EssilorLuxottica and the Fashion Houses, namely, that they are multi-year licenses for the distribution and sale of Premium-Branded Eyewear under which EssilorLuxottica pays the Competing Premium-Branded Eyewear Entities royalties or a portion of gross sales of their brands sold through EssilorLuxottica's retail channels.

66.     The sales agreements contain terms in common with the anticompetitive Exclusive Licensing Agreements between EssilorLuxottica and the Fashion Houses, namely, that they are multi-year licenses for the distribution and sale of Premium-Branded Eyewear under which EssilorLuxottica pays the Competing Eyewear Entities royalties or a portion of gross sales of their brands sold through EssilorLuxottica's retail channels.

67.     The Competing Eyewear Entities' brands of Premium-Branded Eyewear include well-known, commercially successful brands such as Balenciaga; Chloe; Gucci; Maui Jim; Saint Laurent; Marcolin: Tom Ford; Dior Celine; Fendi

68.     The sales agreements with Competing Eyewear Entities are lengthy, multi- year licenses for the sale and distribution of the Competing Eyewear Entities' brands of Premium-Branded Eyewear (the "Sales Agreements").

---

[22] "Competing Eyewear Entities" include Kering S.A., Kering Eyewear S.p.A., Kering Eyewear USA, Inc., LVMH Moët Hennessy Louis Vuitton SE, LVMH Moët Hennessy Louis Vuitton Inc., Christian Dior SE, Christian Dior, Inc., Marcolin S.p.A., Marcolin U.S.A. Eyewear Corp., Thélios S.p.A., and Thelios USA Inc.

69.     Under the Sales Agreements, EssilorLuxottica pays the Competing Eyewear Entities royalties or a portion of the gross total sales of their Premium-Branded Eyewear sold through EssilorLuxottica's Retail Outlets.

70.     The Sales Agreements grant EssilorLuxottica the authority to set prices for the Competing Eyewear Entities' brands of Premium-Branded Eyewear, or otherwise provide the means for EssilorLuxottica to control the prices of the Competing Eyewear Entities' brands of Premium-Branded Eyewear, in effect establishing retail price floors, or include a most-favored nation clause or similar price coordination clauses, that result in the alignment of prices for Premium-Branded Eyewear Competitors to supra-competitive levels as dictated by EssilorLuxottica for the benefit of EssilorLuxottica and the Premium-Branded Eyewear Competitors at consumers' expense.

71.     The Sales Agreements grant EssilorLuxottica the authority to set prices for the Licensed Brants of Premium-Branded Eyewear, or otherwise provide the means for EssilorLuxottica to control, maintain, and inflate the prices for the Licensed Brands of Eyewear in the United States, causing injury to Plaintiff and Class Members.

### c.     The Most Favored Nation Agreements

72.     EssilorLuxottica distributes its Proprietary Brands and Licensed Brands to third parties for resale ("Third Party Sellers") under limited terms and conditions. These distribution agreements include pricing restrictions, such as most-favored nation clauses, which prevent the Third Party Sellers from selling the Proprietary Brands or Licensed Brands at a discounted rate ("MFN Agreements"). The MFN Agreements prevent price competition which allows EssilorLuxottica to collect supracompetitive prices from Plaintiff and Class Members.

73.     MFN clauses allow monopolists to preserve and maintain their market dominance. Having acquired market power, MFN clauses prevent price competition by preventing any

competitors from undercutting a monopolist on price. MFN clauses have an even more pernicious effect where, as here, Retail Outlets and the Premium-Branded Eyewear products they sell are established brands, so that competitors, who would be unable to compete on price, cannot acquire a customer base large enough to pose a competitive threat to EssilorLuxottica.

3. **EssilorLuxottica uses Vertical Restraints to Acquire and Maintain Their Monopoly Power.**

74.    Defendants use a variety of vertical restraints to control pricing decisions on its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors though its control of a leading vision benefits provider (through its subsidiary, EyeMed) and networks of optometric practices (through its subsidiary Vision Source).

a. **EyeMed**

75.    EyeMed is a wholly owned subsidiary of EssilorLuxottica, and one of the largest vision benefits companies in the United States.

76.    EyeMed insures nearly 72 million individuals and touts itself as "America's fastest growing vision benefits company" with America's largest vision network.[23]  EssilorLuxottica exercises control more than 83% of optometrists in the United States.[24]  In-network physical and online providers include, inter alia, LensCrafters, Pearle Vision, Target Optical, glasses.com, lencrafters.com, ray-ban.com, and targetoptical.com-all of which are wholly-owned by EssilorLuxottica.

77.     EyeMed markets its Captive Optometrist Groups' services to its insureds without disclosing the relationship between EyeMed and the Captive Optometrist Groups.

---

[23] *Why EyeMed*, EYEMED.COM, https://www.eyemed.com/en-us/employers/why-eyemed (last accessed Nov. 28, 2023).
[24] Balto, supra n.5.

78.     EyeMed requires all of its in-network eyecare professionals to comply "with all contractual commitments and policies" and otherwise "to be in good standing with EssilorLuxottica and all relevant subsidiaries,"[25] and to use our EyeMed's labs for all EyeMed member eyewear.

79.     Thus, EyeMed steers patients to members of its Captive Optometrist Groups and eyecare professionals who are contractually committed to providing EssilorLuxottica products and services, sometimes exclusively.

80.     Eyecare professionals who participate in this scheme may feel they have no choice. EyeMed occupies a dominant position in the vision benefits market. These eyecare professionals cannot risk losing access to EyeMed's 72 million insureds.

**b.     Vision Source**

81.     Vision Source is a network of thousands of optometrists.  Vision Source contracts with these optometrists for the sale of EssilorLuxottica's Proprietary Brands and Licensed Brands of Premium-Branded Eyewear.

82.     Vision Source is the leading optical retailer in the United States, with nearly 3000 locations selling more than $2.6 billion in 2022.[26]  Vision Source's network treats an estimated 16 million patients annually and comprises comprises the largest optical retailer in the United States

83.     Each of Vision Source's 3,100 optometric practices is a franchisee that is required to maintain or market a certain inventory of Proprietary Brands and Licensed Brands of Premium-Branded Eyewear or to ensure that a certain portion or gross total of its Premium-Branded Eyewear

---

[25] *EyeMed July 2023 Provider Manual*, 4, available at:
https://www.eyemedinfocus.com/wp-content/uploads/2023/05/April-2023-PM-Final-Clean-4.10.23.pdf.

[26] *VM Top 50 U.S. Optical Retailers 2023*, VISION MONDAY, 20 (2023),
https://www.visionmonday.com/CMSDocuments/2023/06/vmtop50retailerschart_2023.pdf

sales to EyeMed members are based on Proprietary Brands and Licensed Brands of Premium-Branded Eyewear.

84.     Many Vision Source franchisees do not identify to consumers that they are tied to Vision Source or EssilorLuxottica. Instead, they hold themselves out as independent eyecare professionals, from whom consumers expect independent judgment about what eyewear to carry and fit and how to price it.

85.     Each of Vision Source's optometric practices, corporate-owned entities, and independent franchises are bound to the retail price controls set by EssilorLuxottica on the sale of any Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors. Upon information and belief, EssilorLuxottica maintains the retail price of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors pursuant to a delegated pricing authority or other price coordination clauses contained in its anticompetitive exclusive licensing and sales agreements.

      **c.   Minimum Resale Price Maintenance Agreements**.

86.     The MFN Agreements include horizontal and vertical agreements because EssilorLuxottica is vertically integrated.

87.     Third Party Sellers compete horizontally with EssilorLuxottica's Retail Outlets, such as LensCrafter, Pearle Vision, Target Optical and Sunglass Hut.

88.     The MFN Agreements serve as restraints on the ability of Third Party Sellers to set competitive prices, particularly their ability to discount or promote discounts. These MFN Agreements therefore also operate as minimum resale price maintenance ("RPM") agreements ("RPM Agreements").

C.    **National Competition Authority's Investigation of Defendants' Conduct and Practices**.

89.    During the Class Period, the Autorité de la concurrence ("Autorité"), France's competition authority, fined Defendants and related corporate entities hundreds of millions of euros

90.    More specifically, in Decision No. 21-D-20 of July 22, 2021 relating to practices implemented in the eyewear and eyeglass frames sector, the Autorité fined Luxottica Group S.p.A. and Luxottica France SASU 125,174,000€ for anticompetitive conduct related to frames for eyeglasses and sunglasses, finding that its distribution agreements, certain restrictions imposed on retailers, and retaliatory measures levelled against opticians who ignored Luxottica's "messages" "caused significant damage to the economy."[27]

91.    In Decision No. 22-D-16 of October 6, 2022, relating to practices implemented in the optical lens sector, the Autorité fined Essilor International SAS and EssilorLuxottica SA a combined 96,467,432€ for anticompetitive practices related to corrective lenses for eyeglasses and sunglasses. The Autorité found that Essilor International SAS and EssilorLuxottica SA had harmed competition by restricting sales of corrective lenses and frames through online channels of distribution. With respect to frames, the Autorité further found that Essilor International SAS and EssilorLuxottica SA had also entered minimum resale price maintenance agreements with retailers. These practices "kept prices high." [28]

---

[27] Several eyewear brands and manufacturers fined for imposing selling prices and restrictions on online sales.  https://www.autoritedelaconcurrence.fr/en/communiques-de-presse/several-eyewear-brands-and-manufacturers-fined-imposing-selling-prices-and (last visited Nov. 28, 2023)

[28] Optical lenses sector: the Autorité de la concurrence hands out fines worth 81 067 400 euros to Essilor International SAS and its parent company EssilorLuxottica SA for discriminatory trade

## VIII.   FRAUDULENT CONCEALMENT

92.    The Premium-Branded Eyewear market is not exempt from antitrust regulation. Plaintiff and the other Class Members thus reasonably assumed until shortly before this complaint's filing that this market was behaving in a competitive manner.

93.    Defendants concealed the terms of their unlawful agreements, as described in this Complaint, from Plaintiff and Class Members. Plaintiff and Class Members were not placed on actual, constructive, or inquiry notice of Defendants' antitrust violations by any facts that were known or reasonably should have been known to them.

94.    The Licensing Agreements, Sales Agreements, and the agreements between EyeMed and its in-network providers contain provisions preventing the parties from disclosing the agreements' terms to the public.

95.    Defendants deceive reasonable consumers about the existence of competition in the Premium-Branded Eyewear Market by holding themselves out as so many separate brands and retailers, when in fact, all the Premium-Branded Eyewear brands and Premium-Branded Eyewear retailers discussed in this Complaint are owned or controlled by EssilorLuxottica.

96.    Although Plaintiff exercised reasonable diligence, such diligence would not have, and did not, reveal the Defendants' conspiracy because Defendants used deceptive practices to conceal their combination.

97.    Defendants sought to avoid detection of their anticompetitive activities by communicating orally and deleting emails.  For instance, the commercial director of Luxottica France sent an internal email on December 11, 2008, stating:

---

practices.   https://www.autoritedelaconcurrence.fr/en/press-release/optical-lenses-sector-autorite-de-la-concurrence-hands-out-fines-worth-81-067-400 (last visited Nov. 28, 2023)

Philippe can you contact the optician on this point ONLY BY TELEPHONE.

PLEASE DELETE ALL YOUR EMAILS ON THIS SUBJECT IMMEDIATELY.[29]

This email communication related to Defendants' minimum resale price maintenance agreements with eyecare professionals and the legal compliance issues and legal risks related thereto.

98.     Defendants' internal emails make clear that their vertical restraints were not limited to France. For instance, the marketing director of Luxottica UK sent an internal email recommending that Luxottica salespeople intervene with distributors with low pricing, "taking care to erase the traces [of] written records of the corresponding exchange."[30]

99.     EssilorLuxottica acted as a unified entity with respect to the antitrust violations alleged in this Complaint. EssilorLuxottica engaged in the same anticompetitive conduct in the United States as it did in Europe. It is likely that EssilorLuxottica took similar steps to conceal its actions within, and targeted at, the United States.

100.     Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiff and the Class as a result of Defendants' anticompetitive and unlawful conduct. Plaintiff and the other Members of the Class were unaware of Defendants' unlawful conduct and did not know they were paying supra-competitive prices Eyewear during the Class Period. For these reasons, Plaintiff's claims are timely under the federal laws identified herein.

## IX.    ANTITRUST INJURY TO CONSUMERS

101.     Plaintiff and the Class suffered antitrust injury.

102.     The purpose of EssilorLuxottica's conduct was to exclude competition and collect monopoly rents for its Premium-Branded Eyewear.

---

[29] FCA 21-D-20 *supra* note 27 at 79-80, 130 (emphasis in original) (Machine translated by Google).

[30] Id. at 214.

103. EssilorLuxottica's conduct resulted in lessened competition in the Premium-Branded Eyewear Market, allowing EssilorLuxottica to charge supracompetitive prices to consumers for Premium-Branded Eyewear, and to require its co-conspirators to charge supracompetitive prices for Premium-Branded Eyewear.

104. Because of the decreased competition in the Premium-Branded Eyewear Market there is insufficient competition to require EssilorLuxottica to improve their non-price services.

105. The precise amount of the overcharge during the Class Period can be measured and quantified using well-accepted models used by economists, statisticians, or econometricians.

106. By reason of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X. DEFENDANTS' CONDUCT HAS NO PRO-COMPETITIVE BENEFITS.

107. Defendants' anticompetitive conduct did not benefit competition and did not produce pro-competitive effects in the Premium-Branded Eyewear market.

108. Defendants' anticompetitive conduct, however, did benefit Defendants by causing consumers to pay artificially inflated prices for Premium-Branded Eyewear.

109. And even if Defendants' anticompetitive conduct increased Defendants' operational efficiencies by saving time, labor costs, and other resources, it has nonetheless made it more difficult and time-consuming for consumers to identify and secure meaningfully competitive pricing for Premium-Branded Eyewear. Thus, any pro-competitive benefits resulting from Defendants' misconduct is outweighed the significant and ongoing anticompetitive effects of that misconduct.

## XI.     CLASS ACTION ALLEGATIONS

110.    Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the proposed Direct Purchaser Plaintiff Class defined as follows:

> Any person in the United States who directly purchased, for their personal or household consumption, one or more of Defendants' Proprietary Brands or Licensed Brands of Eyewear or the brands of Premium-Branded Eyewear competitors directly from one or more of Defendants' Retail Outlets or Defendants' co-conspirators from January 2, 2010 to the present (the "Class Period").

Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, and the Court and its personnel assigned to this matter.

111.    The Class is so numerous that joinder of all members would be impracticable.

112.    Though Plaintiff does not know the exact number of Class Members, there are likely millions of Class Members.  The Class Members, moreover, can be readily identified and notified in an administratively feasible manner using, among other information, the electronic transactional records of Defendants.

113.    Plaintiff's claims are typical of those of the Class. Plaintiff and all Members of the Class allege that Defendants' alleged misconduct violates Section 1 of the Sherman Act. Plaintiff and all Class Members also allege and will show that they were injured by the same anticompetitive and unlawful conduct that resulted in them paying more for Premium-Branded Eyewear than they otherwise would have paid in the absence of their collusive conduct.

114.    Common questions of law and fact exist as to all Class Members. Defendants' conduct was generally applicable to all Class Members, thereby making it appropriate for the Court to grant relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

a.      Whether Defendants entered into Exclusive Licensing Agreements;

b.      Whether Defendants entered into Sales Agreements;

c.      Whether Defendants entered into MFN Agreements;

d.      Whether Defendants entered into RPM Agreements;

e.      Whether Defendants possess market power in the Premium-Branded Eyewear Market;

f.      Whether Defendants charged supracompetitive prices for their Premium-Branded Eyewear;

g.      Whether Defendants required or incentivized third parties to charge supracompetitive prices for their Premium-Branded Eyewear;

h.      Whether Defendants' conduct unreasonably restrained trade or lessened competition;

i.      The proper measure of Class-wide damages;

j.      The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged conduct going forward;

k.      Whether Defendants fraudulently concealed the existence of the alleged conspiracy such that the statute of limitations is tolled; and

l.      Whether injunctive and declaratory relief is appropriate to put a stop to Defendants' anticompetitive conduct and the harms it continues to cause.

115.    Plaintiff will fairly and adequately protect and represent the interests of Class Members. The interests of Plaintiff and Plaintiff's counsel are fully aligned with, and not antagonistic to, the interests of the Class Members. Plaintiff is willing and able to assume the duties of a class representative to protect the interests of all Class Members. In addition, Plaintiff's counsel has significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

116.    Questions of law and fact common to the Members of the Class will predominate over any individualized questions of law or fact. Defendants have acted and refused to act on grounds generally applicable to the Class.

117.    Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow the thousands of Class Members to prosecute their common claims, and for Defendants to defend themselves against these claims, in front of a single court simultaneously and efficiently before ultimately reaching resolution without unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## XI.    CAUSES OF ACTION

### COUNT I

### Monopolization (15 U.S.C. § 2)

118.    Plaintiff incorporates the allegations in the above numbered paragraphs.

119.    The relevant product market is the Premium-Branded Eyewear Market.

120.    The relevant geographic market is the United States.

121.    EssilorLuxottica has had and continues to have monopoly price-setting power in the United States for Premium-Branded Eyewear.

122.    EssilorLuxottica willfully acquired and maintains that market power through anticompetitive, exclusionary, and predatory conduct, which EssilorLuxottica intended to have, and did actually have, the effects of foreclosing competition in the Premium-Branded Eyewear Market and inflating the price of Premium-Branded Eyewear.

123.    As described in more detail above, EssilorLuxottica's acquisitions center on acquiring market power and using its market power to prevent would-be competitors from entering the market or gaining market share and to suppress competition.

124.   EssilorLuxottica's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

125.   EssilorLuxotica's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

126.   EssilorLuxottica's conduct constitutes unlawful monopolization in violation of Section 2 of the Sherman Antitrust Act.

93.   As a direct and proximate result of EssilorLuxottica's continuing violation of Section 2 of the Sherman Antitrust Act, prices of EssilorLuxottica's Proprietary Brands and Licensed Brands of Eyewear in the Premium-Branded Eyewear Market have been and continue to be inflated above competitive levels, causing injury to Plaintiff and Members of the Class.

127.   Plaintiff, on behalf of herself and the Class, seeks damages and injunctive relief. The violations described above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT II

### Attempted Monopolization (15 U.S.C. § 2)

128.   Plaintiff incorporates the allegations in the above numbered paragraphs.

129.   The relevant product market is the Premium-Branded Eyewear Market.

130.   The relevant geographic market is the United States.

131.   As detailed above, EssilorLuxottica has monopoly power. In the alternative, and at a minimum, it possesses a dangerous probability of success in acquiring monopoly power in the Premium-Branded Eyewear Market, including the power to control prices and exclude competition.

132.   EssilorLuxottica specifically attempted to acquire and maintain that market power through anticompetitive, exclusionary, and predatory conduct, which EssilorLuxottica intended to

29

have the effects of foreclosing competition in the Premium-Branded Eyewear Market and inflating the price of Premium-Branded Eyewear.

133.    As described in more detail above, EssilorLuxottica's acquisitions center on acquiring market power and using its market power to prevent would-be competitors from entering the market or gaining market share and to suppress competition.

134.    EssilorLuxottica's   unlawful   conduct   constitutes   unlawful   attempted monopolization in violation of Section 2 of the Sherman Antitrust Act.

135.    As a direct and proximate result of EssilorLuxottica's continuing violation of Section 2 of the Sherman Antitrust Act, prices of EssilorLuxottica's Proprietary Brands and Licensed Brands of Eyewear in the Premium-Branded Eyewear Market have been and continue to be inflated above competitive levels, causing injury to Plaintiff and Members of the Class.

136.    There are no procompetitive justifications for EssilorLuxottica's anticompetitive and monopolistic conduct, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

137.    Plaintiff, on behalf of herself and the Class, seeks damages and injunctive relief. The violations described above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT III

### Unlawful Minimum RPM Agreements (15 U.S.C. § 2)

138.    Plaintiff incorporates the allegations in the above numbered paragraphs.

139.    The relevant product market is the Premium-Branded Eyewear Market.

140.    The relevant geographic market is the United States.

141.    As described in more detail above, EssilorLuxottica has contracted with Third Party Sellers to set the prices at which EssilorLuxottica's Proprietary Brands and Licensed Brands of

Premium-Branded Eyewear are resold to consumers. In particular, EssilorLuxottica prevents discounting or advertised discounts, which has permitted it and Third Party Sellers to collect supracompetitive prices for the Premium-Branded Eyewear.

142.    As a direct and proximate result of EssilorLuxottica's continuing violation of Section 2 of the Sherman Antitrust Act, prices of EssilorLuxottica's Proprietary Brands and Licensed Brands of Eyewear in the Eyewear Market have been and continue to be inflated above competitive levels, causing injury to Plaintiff and Members of the Class.

143.    Plaintiff, on behalf of herself and the Class, seeks damages and injunctive relief. The violations described above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## PRAYER FOR RELIEF

144.    Plaintiff, on behalf of herself and all others similarly situated, respectfully pray that this Honorable Court:

a.    Order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that Plaintiff be appointed representative of the Class, that the undersigned be appointed Class Counsel, and that reasonable notice of this action be provided to Members of the Class as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

b.    Adjudge that Defendants violated the federal antitrust laws as set forth above;

c.    Award Plaintiff and Members of the Class actual, double, treble, and exemplary damages as permitted

d.    Enjoin Defendants from continuing the unlawful actions alleged herein;

e.    Award Plaintiff reasonable attorneys' fees and costs as allowed by law;

f.      Award Plaintiff pre-judgment and post-judgment interest at the highest rate allowed

by law; and

g.      Plaintiff and the Class be granted such other and further relief as the Court deems

just and proper.

## DEMAND FOR JURY TRIAL

145.    Plaintiff demands a trial by jury as to all matters so triable.


Dated:  November  29, 2023                    Respectfully Submitted,

                                              **REINHARDT WENDORF & BLANCHFIELD**

                                               _/s/Garrett D. Blanchfield_
                                              Garrett D. Blanchfield (#209855)
                                              Brant D. Penney (#316878)
                                              Roberta A. Yard (#322295)
                                              332 Minnesota Street, Suite W-1050
                                              St. Paul, MN   55101
                                              T: (651) 287-2100
                                              g.blanchfield@rwblawfirm.com
                                              b.penney@rwblawfirm.com
                                              r.yard@rwblawfirm.com


                                              **SPECTOR ROSEMAN & KODROFF, P.C.**
                                              William G. Caldes (_Pro Hac Vice_ forthcoming)
                                              Jeffery L. Spector (_Pro Hac Vice_ forthcoming)
                                              2001 Market Street, Suite 3420
                                              Philadelphia, PA 19103
                                              Tel: (215) 496-0300
                                              BCaldes@srkattorneys.com
                                              JSpector@srkattorneys.com


                                              _Attorneys for Plaintiff Tara Foster and the_
                                              _Proposed Class_